STATE of Utah, Plaintiff and Appellee,

v.

Jason Thomas GENOVESI, Defendant and Appellant.

No. 940708–CA.

Court of Appeals of Utah.

Dec. 29, 1995.

Bradley P. Rich (Argued), Hakeem Ishola Yengich, Rich & Xaiz, Salt Lake City, for Appellant.

J. Kevin Murphy (Argued), Assistant Attorney General, Jan Graham, State Attorney General, Salt Lake City, for Appellee.

Before ORME, P.J., and GREENWOOD and WILKINS, JJ.

ORME, Presiding Judge:

This case is before us for a second time. *See State v. Genovesi*, 871 P.2d 547 (Utah App.1994). Following remand and the entry of more detailed findings, Jason Thomas Genovesi again appeals his conviction for manslaughter in the death of his two-year old stepson. He raises a number of Fourth Amendment issues. We affirm.

### FACTS

On the afternoon of March 20, 1992, paramedics responded to a "911" call from a home shared by defendant Jason Genovesi, his spouse, Lisa, and her two children from a prior marriage. Defendant, who had been at home tending the children while his wife was at work, made the call to report an injury to one of the children, a two-year-old boy. Upon arriving at the residence, the paramed-ics found defendant kneeling over the child on the living room floor. The child appeared to have suffered a broken neck. Resuscitation efforts ensued but were unavailing, and the child was pronounced dead shortly after his arrival at a nearby hospital.

Law enforcement officers also responded to the emergency call, arriving while medical personnel were working on the child. Officer Kendra Herlin, among the first to arrive, observed the resuscitation efforts and spoke briefly to defendant and to medical personnel. Based on the information she obtained, Officer Herlin secured the area as a possible crime scene.

Soon after the paramedics took the victim to the hospital, Officer Kenneth R. Patrick arrived at defendant's residence. Officer Patrick made a cursory search of the residence, seized a wash cloth that had apparently been used in attending to the child's injuries, and took some photographs of the home's interior. Officer Patrick spoke briefly with defendant and then requested that defendant accompany him to the police station for further questioning. Upon completing his questioning of defendant, Officer Patrick arrested him for child abuse. The next day, March 21, Officer Patrick telephoned Lisa Genovesi and requested permission to re-enter the Genovesi home to "take measurements and search for evidence." Lisa Genovesi agreed. Because Lisa Genovesi was staying elsewhere in the aftermath of her son's death, she made arrangements to have one of her friends meet Officer Patrick at her home with a key.

During this search, Officer Patrick, assisted by another officer, took measurements and additional photographs, particularly of a bunk bed from which, according to defendant, the child had fallen the previous day, causing his fatal injuries. In the children's bedroom in which the bunk bed was located, the officers observed what they took to be a head-shaped dent in the wall, with a piece of hair in it. The officers seized and preserved the strand of hair and cut away and removed the dented section of the wall, as well as a section of carpet and padding from the bedroom floor. The officers conducted this

search, as well as the search on the previous day, without first procuring a search warrant.

Based on the officers' investigation, defendant was charged with first degree murder, in violation of Utah Code Ann. § 76–5–203 (1990). Prior to trial, defendant moved to suppress all evidence obtained as a result of the above searches of his home on the grounds that those searches violated his rights under the Fourth Amendment to the United States Constitution and Article I, section 14, of the Utah Constitution. Following an evidentiary hearing, the trial court denied defendant's motion. Defendant was subsequently tried by a jury. Apparently not satisfied that the State had proven the elements of murder beyond a reasonable doubt, the jury convicted defendant of manslaughter, a second degree felony, in violation of Utah Code Ann. § 76–5–205 (1992).

Defendant appealed, arguing, inter alia, that the findings of fact and conclusions of law supporting the trial court's order denying his motion to suppress were insufficient to permit adequate appellate review and, therefore, required remand. *State v. Genovesi*, 871 P.2d 547, 549 (Utah App.1994). In a divided opinion, this court granted defendant's request for remand and directed the trial court to enter more detailed findings of fact and conclusions of law supporting its denial of defendant's motion to suppress the evidence obtained pursuant to the searches of his home. *Id.* at 552. On remand, the trial court reviewed the existing record, plus the transcript of defendant's preliminary hearing, and entered detailed findings of fact and conclusions of law addressing the searches of the Genovesi home. The court again denied defendant's motion to suppress and defendant appealed for a second time.

In the instant appeal, defendant argues that the trial court erred in denying his motion to suppress because (1) his wife's consent to the second search of the home was invalid under the Fourth Amendment to the United States Constitution and Article I, section 14, of the Utah Constitution and (2) there were no exigent circumstances justifying the warrantless search of the Genovesi home in the first instance. The State responds that (1) defendant waived his right to contest the first search by not specifically objecting to it; (2) both searches were valid under the Fourth Amendment to the United States Constitution and Article I, section 14, of the Utah Constitution, although the extent of the second search exceeded the scope of Lisa Genovesi's consent; and (3) any error in refusing to suppress the evidence obtained in the searches was harmless.

## LEGALITY OF SEARCHES

Subject to very few exceptions,[1] if a violation of the Fourth Amendment has occurred and the fruits of that violation are subsequently offered into evidence against a defendant who has standing to object and who properly objects,[2] the trial court must suppress the evidence at trial. Moreover, if the tainted evidence is not excluded and the defendant is thereafter convicted, his or her conviction must be overturned and a new trial ordered unless the erroneous admission of evidence was harmless. Accordingly, we must first examine the two challenged searches and determine whether they fall within the recognized limited exceptions to the Fourth Amendment warrant requirement. If we determine that these searches did indeed violate the Fourth Amendment,[3]

1. The exceptions to this general rule are thoroughly described in Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* §§ 1.3, 11.6 (2d ed. 1987).

2. The State's contention that defendant waived his right to challenge the admission of evidence obtained in the March 20 search by failing to specifically contest the propriety of that search in his written motion to suppress is problematic. *See* Utah R.Crim.P. 12(b)(2) & (d). However, given our resolution of this appeal, i.e., that any error concerning the admission of evidence pro-

cured through the two searches was harmless beyond a reasonable doubt, we need not evaluate this contention.

3. In only one respect has defendant argued that Article I, section 14, of the Utah Constitution affords greater protection than that which is provided by the Fourth Amendment. The exception is in the context of Lisa Genovesi's consent to the March 21 search, treated in the next section. Accordingly, with that one exception, we treat the Article I, section 14, arguments in the same

we must then determine whether the admission of the illegally seized evidence was harmless.

### A. March 21 Search

#### 1. Voluntary Consent

■ The trial court upheld the March 21 search based on Lisa Genovesi's voluntary consent. Defendant contends that his wife's consent was not voluntary because she was unaware of her right to refuse consent. He argues that, on the strength of Article I, section 14, of the Utah Constitution, we should mandate *Miranda*-type disclosures about one's rights when police ask for permission to conduct a search. *Cf. State v. Bobo*, 803 P.2d 1268, 1272 n. 3 (Utah App. 1990) (setting forth possible standardized *Miranda*-type disclosure in consent-to-search context). We recently rejected this contention and held that proving voluntary consent under the Utah Constitution, as well as its federal counterpart, does not include proving that the defendant knew of his or her right to refuse to consent to a search. *State v. Contrel*, 886 P.2d 107, 111–12 (Utah App.1994), *cert. denied*, 899 P.2d 1231 (Utah 1995). Instead, we evaluate whether Lisa Genovesi's consent was "freely and intelligently" given based on the "totality of the circumstances," with actual knowledge of the right to refuse being but one factor in the analysis. *See id.; State v. Whittenback*, 621 P.2d 103, 106 (Utah 1980); *State v. Webb*, 790 P.2d 65, 82–83 (Utah App.1990).

■ In the instant case, Officer Patrick made no "claim of authority," he did not exhibit force, nor did he secure permission to search through "deception or trick." *Whittenback*, 621 P.2d at 106. Instead, the record indicates the police merely requested to search and received Lisa Genovesi's complete cooperation. Because the record demonstrates that Lisa Genovesi's consent was "unequivocal, specific, and freely and intelligently given," and was obtained "without duress or coercion, express or implied," the presumption against waiver of her constitutional right to refuse the search was overcome. *See Webb*, 790 P.2d at 82. Under the totality of the circumstances, the State has met its burden of proving that Lisa Genovesi's consent to search her home was voluntarily given.

#### 2. Scope Of Consent

■ The parties agree on several key concepts. First, consent can legitimize what would otherwise be an illegal and unreasonable search. Second, the scope of a consent search is limited by the bounds, and determined by the breadth, of the actual consent itself. Finally, although the search in question was conducted with Lisa Genovesi's voluntary consent, the State concedes that the trial court correctly determined that removal of the piece of wall and carpeting was beyond the scope of her consent.[4] We agree.

As a matter of law, Lisa Genovesi's general consent to search the house does not include consent to tear out part of a wall or cut away a piece of carpet. *See State v. Koucoules*, 343 A.2d 860, 867 (Me.1974). *See also* Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 8.1(c), at 161 (2d ed. 1987) (general unqualified consent to search premises does not include consent to destroy property). Because the March 21 search exceeded the scope of Lisa Genovesi's consent, the court should not have admitted into evidence the sections of the wall and carpet that were illegally seized.[5]

way the parties do, i.e., as completely co-extensive with their Fourth Amendment arguments.

**4.** The trial court's conclusion that defendant's motion to suppress was nonetheless properly denied because he failed to separately identify these particular items in his motion is without merit. Defendant, in his written motion, asked the court "to enter an order suppressing *all* evidence obtained as a result of the warrantless search of the defendant's residence." Similarly, the court erred by shifting the burden to defendant to prove that "had she been asked, Mrs. Genovesi would have withheld her consent with respect to these items." *See United States v. Maestas*, 2 F.3d 1485, 1491 (10th Cir.1993) (when defendant questions a warrantless residential search, burden is always on government to demonstrate search falls within recognized exception).

**5.** However, it was not error for the court to admit into evidence the measurements and photographs taken, or the hair seized, on March 21, as those items were clearly within the scope of Lisa Genovesi's express consent to enter the home and "search for evidence."

## B. March 20 Search

■ Defendant concedes the initial entry into his home by paramedics and police was justified because it was in response to the "911" call that he initiated. Defendant argues, however, that once the paramedics had removed the victim from the home, the emergency dissipated and, thus, the police could not properly have conducted a warrantless search of his home based on exigent circumstances that no longer existed. *See Mincey v. Arizona,* 437 U.S. 385, 393, 98 S.Ct. 2408, 2413–14, 57 L.Ed.2d 290 (1978); *United States v. Booth,* 455 A.2d 1351, 1356 (D.C.App.1983). *See also State v. Geisler,* 222 Conn. 672, 610 A.2d 1225, 1237 (1992) (even if police entry to give emergency aid was lawful, "once they ascertained that [occupant] was physically well they should have withdrawn"); *State v. Miller,* 300 Or. 203, 709 P.2d 225, 244 (1985) (while initial warrantless entry based on emergency was lawful, "[a]fter the officer entered the room and found the victim dead, ... the emergency situation ceased"), *cert. denied,* 475 U.S. 1141, 106 S.Ct. 1793, 90 L.Ed.2d 339 (1986); *State v. Beaumier,* 480 A.2d 1367, 1373–74 (R.I.1984) (police could not remain on premises and investigate without warrant after injured party was arrested and removed from premises). Defendant contends the home could have been secured so that evidence would not be lost or destroyed while the police sought a search warrant from a magistrate.

■ The Fourth Amendment to the United States Constitution and its counterpart in our state constitution prohibit only unreasonable searches and seizures. It is clear that "police officers [may] conduct limited, warrantless entries and searches of premises in emergency situations." *State v. Pursifull,* 751 P.2d 825, 827 (Utah App.1988). Thus, police officers may enter a dwelling without a warrant to render emergency aid to a person they reasonably believe to be in need of assistance and "promptly search the scene of a homicide for other victims or a killer on the premises." *Id.* However, not every homicide scene presents exigent circumstances justifying a warrantless search, despite the nature and seriousness of the crime. *Id.* (citing *Mincey,* 437 U.S. at 392–93, 98 S.Ct. at 2413).[6]

In the instant case, the police were called to the scene to provide back-up for the medical personnel and investigate the possible death of a child. They promptly made a cursory search of the premises, took photographs of the interior of the Genovesi residence, and seized a washcloth that was used in attending to the victim's injuries.[7]

The trial court reasoned that "the cursory inspection was [reasonably] necessary to find and preserve any pertinent evidence while it was fresh, and the scene undisturbed," and thus concluded that the March 20 search, incident to the "911" call, did not exceed permissible limits. However, we need not definitively determine whether the scope of the search was "strictly circumscribed by the exigencies which justif[ied] its initiation," *Terry v. Ohio,* 392 U.S. 1, 25–26, 88 S.Ct. 1868, 1882, 20 L.Ed.2d 889 (1968), if the challenged evidence had no significant impact on defendant's conviction. *See State v. Villarreal,* 889 P.2d 419, 425–26 (Utah 1995). Therefore, like the search conducted on the

---

6. In *Mincey,* the Supreme Court rejected the existence of a broad "homicide crime scene" exception to the warrant requirement, which exception had previously been embraced by a number of other courts. 437 U.S. at 390–91, 98 S.Ct. at 2412. *See* Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 6.5(e) (2d ed. 1987).

7. Defendant mistakenly relies on *Mincey v. Arizona,* 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978), to support his contention that the March 20 search of his residence was improper. However, the cursory search at issue in the instant case is clearly distinguishable from the exhaustive, four-day, non-consensual search that the United States Supreme Court condemned in *Mincey.* In *Mincey,*

> the entire apartment was searched, photographed, and diagramed. The officers opened drawers, closets, and cupboards, and inspected their contents; they emptied clothing pockets; they dug bullet fragments out of the walls and floors; they pulled up sections of carpet and removed them for examination. Every item in the apartment was closely examined and inventoried, and 200 to 300 objects were seized. In short, Mincey's apartment was subject to an exhaustive and intrusive search.

*Id.* at 389, 98 S.Ct. at 2411.

following day, the pivotal issue regarding the March 20 search is whether admission of the evidence which should have been suppressed was prejudicial to defendant or whether it was harmless.

## HARMLESS ERROR

### A. Burden of Proof

■ The State concedes that the United States Supreme Court has consistently applied the "harmless beyond a reasonable doubt" standard in evaluating failures to suppress evidence as required by the Fourth Amendment. Under this standard, the conviction will be reversed unless the State demonstrates that admission of the illegal evidence was harmless beyond a reasonable doubt. *See, e.g., Chambers v. Maroney,* 399 U.S. 42, 53, 90 S.Ct. 1975, 1982, 26 L.Ed.2d 419 (1970) (conviction upheld when admission of evidence illegally seized was harmless beyond reasonable doubt). *Cf. Bumper v. North Carolina,* 391 U.S. 543, 550, 88 S.Ct. 1788, 1792, 20 L.Ed.2d 797 (1968) (conviction reversed when illegally seized evidence was "plainly damaging" to defendant); *Stoner v. California,* 376 U.S. 483, 490 n. 8, 84 S.Ct. 889, 893 n. 8, 11 L.Ed.2d 856 (1964) (reversing conviction when illegally seized evidence reasonably contributed to conviction); *Fahy v. Connecticut,* 375 U.S. 85, 86–89, 91, 84 S.Ct. 229, 230–31, 11 L.Ed.2d 171 (1963) (conviction reversed when illegally seized evidence was "obviously" incriminating and "clearly" prejudicial, but stating that "[t]he question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction"). The State contends, however, that the United States Supreme Court has been utilizing the wrong standard. The State argues that erroneous failure to grant the exclusionary remedy for illegally seized evidence should be reviewed under the "reasonable likelihood" standard, requiring defendant to prove, on appeal, that absent admission of the illegal evidence, there is a reasonable likelihood he or she would have received a more favorable verdict. *See State v. Verde,* 770 P.2d 116, 120–22 (Utah 1989); Utah R.Crim.P. 30(a). The State asserts that "the question of which harmless error standard applies ... is an open one," as the Utah Supreme Court has yet to address it.

■ Whether a conviction should be affirmed in the face of a violation of a federally protected constitutional right is governed by federal law. *See Chapman v. California,* 386 U.S. 18, 21, 87 S.Ct. 824, 826–27, 17 L.Ed.2d 705 (1967). Accordingly, contrary to the State's assertion that the issue has not really been resolved because it has not been determined by the Utah Supreme Court, the question of which harmless error standard applies in cases involving the admission of evidence seized in violation of the Fourth Amendment has been definitively answered for the entire nation because it has been decided by the United States Supreme Court. *See* Wayne R. LaFave, *Search & Seizure: A Treatise on the Fourth Amendment* § 11.7(e), at 527–29 (2d ed. 1987). *See also Chambers,* 399 U.S. at 53, 90 S.Ct. at 1982. Thus, we "cannot declare federal constitutional error harmless unless we sincerely believe that it was harmless beyond a reasonable doubt." *Scott v. State,* 86 Nev. 145, 465 P.2d 620, 622 (1970) (citing *Chapman,* 386 U.S. at 18, 87 S.Ct. at 824). *See also State v. Tuttle,* 780 P.2d 1203, 1213 n. 12 (Utah 1989) (harmless error standard for nonconstitutional errors "is not as strict as the federal constitutional [harmless error] standard"), *cert. denied,* 494 U.S. 1018, 110 S.Ct. 1323, 108 L.Ed.2d 498 (1990); *State v. Scandrett,* 24 Utah 2d 202, 208, 468 P.2d 639, 643 (1970) (presumption that constitutional error is prejudicial "can be overcome when the court is convinced beyond a reasonable doubt that it had no such prejudicial effect upon the proceedings").

Accordingly, we will affirm defendant's conviction only if we can say, beyond a reasonable doubt, that defendant would still have been convicted of manslaughter even if the trial court had not admitted the improperly seized evidence. *See, e.g., State v. Villarreal,* 889 P.2d 419, 425–26 (Utah 1995) (holding independent evidence, despite arguable flaws, was "so overwhelming that the violations of [defendant's] right to confront his accuser were harmless beyond a reasonable doubt"); *State v. Bullock,* 699 P.2d 753, 756 (Utah 1985) (court's denial of defendant's motion to suppress allegedly tainted in-court

identification testimony was harmless because substantial independent evidence of defendant's guilt was before jury); *Scandrett*, 24 Utah 2d at 208, 468 P.2d at 643 (affirming conviction for second degree murder where guilt was shown by untainted evidence so overwhelmingly that there was no likelihood of a different result).

### B. Review of Evidence

■ Several factors are relevant to our determination of whether an error in admitting evidence was harmless beyond a reasonable doubt, including the importance of the evidence to the prosecution's case, whether the evidence was cumulative, and, of course, the overall strength of the prosecution's case. *Delaware v. Van Arsdall*, 475 U.S. 673, 684, 106 S.Ct. 1431, 1438, 89 L.Ed.2d 674 (1986); *State v. Villarreal*, 889 P.2d 419, 425–26 (Utah 1995); *State v. Scandrett*, 24 Utah 2d 202, 208, 468 P.2d 639, 643 (1970). The State, in accordance with the aforementioned analysis, contends that any error in denying the motion to suppress was harmless because the evidence that was erroneously admitted did not significantly contribute to defendant's conviction and other properly admitted evidence overwhelmingly established his guilt. We agree.

■ We begin by reviewing the evidence seized pursuant to the March 20 search. The State did not offer the wash cloth seized during the March 20 search into evidence. Thus, the wash cloth had absolutely no bearing on defendant's conviction because it was never brought before the jury.

The photographs that the court admitted into evidence showed the bunk bed from which defendant claimed the victim fell and the crib which was alternatively identified as the site of the accident. These photographs, while central to defendant's theory that the victim accidently fell out of bed, were wholly incidental to the State's theory that deliberate, brutal violence killed the child, not a bunk bed mishap.

■ Moreover, with the consent of Lisa Genovesi, Officer Patrick returned on the following day and photographed the interior of the home, including the site of the child's alleged accident. Thus, any error in admitting the photographs taken on March 20 is necessarily harmless, as the police, incident to the consensual search on the following day, would have secured virtually identical photographs.[8]

■ We next turn to the evidence that was seized pursuant to the March 21 search and improperly admitted into evidence. Because the improperly admitted evidence was not a significant part of the State's case; because the improperly admitted evidence was merely cumulative of properly admitted evidence; and because the State presented overwhelming evidence, independent of the erroneously admitted evidence, that established defendant's guilt beyond a reasonable doubt, the improper admission of the sections of wall and carpet had no bearing on State's ability to secure a conviction.[9] *See*

---

**8.** The inevitable discovery rule allows the admission of evidence "[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means." *Nix v. Williams*, 467 U.S. 431, 444, 104 S.Ct. 2501, 2509, 81 L.Ed.2d 377 (1984). *See, e.g., People v. Freeman*, 739 P.2d 856, 860 (Colo.App.1987) (body of deceased victim was so conspicuously located that discovery was inevitable); *State v. Miller*, 300 Or. 203, 709 P.2d 225, 242–43 (1985) (hotel maid would inevitably have discovered body of deceased victim within 56 hours of actual discovery and reported discovery to police), *cert. denied*, 475 U.S. 1141, 106 S.Ct. 1793, 90 L.Ed.2d 339 (1986). Under this rule, the prosecution must show that the evidence "would" have been discovered, not simply that it "could" or "might" have been discovered. *Miller*, 709 P.2d at 242. *See also United States v. Romero*,

692 F.2d 699, 704 (10th Cir.1982). Although it is unclear from our record which photographs were taken on March 20 and which were taken on March 21, it is inarguable that the potential illegality surrounding the March 20 search was harmless because the proper and predictable investigatory procedures undertaken the next day inevitably would have resulted in the same photographs being taken on March 21 with Lisa Genovesi's consent. Significantly, the State made no effort to highlight any discrepancies between what the March 20 and March 21 photographs showed. The timing of the photographs was wholly inconsequential to the illustrative, "lay-of-the-land" purposes for which the State used the photographs.

**9.** We have already determined that the measurements, photographs, and strand of hair taken

*Van Arsdall,* 475 U.S. at 684, 106 S.Ct. at 1438; *Villarreal,* 889 P.2d at 425–26; *Scandrett,* 24 Utah 2d at 208, 468 P.2d at 643.

The improperly admitted evidence was not a significant factor in defendant's conviction. The sections of wall and carpet removed from the home during the March 21 search, although admitted into evidence by the State, were all pieces of evidence that were primarily used by *defendant,* not the State. It was defendant who vigorously argued that the child had died by falling from the bunk-bed, hitting his head against the wall (thereby causing the dent) and impacting with the thinly carpeted floor below. Thus, if anything, the improperly admitted evidence served to assist defendant in presenting an alternative theory for the child's death and had no significant impact on defendant's conviction for manslaughter.

We do not mean to suggest that the State made no use of the dented section of the wall. In an apparent attempt to refute defendant's theory, the prosecutor argued that the dent in the wall was almost certainly too high to have been caused by the impact of a two-year old falling out of bed. Nevertheless, photographs of the dented wall properly came before the jury in any event. The section of the wall containing the dent was merely cumulative of other properly admitted evidence that clearly showed the very same dent. Thus, allowing the jury to see the actual dent was in no way prejudicial to defendant's case. *See supra* notes 5 & 9.

Moreover, the properly admitted evidence presented by the State was convincing and sufficient to support all of the essential elements of the State's case against defendant. The State presented overwhelming evidence, independent of the erroneously admitted evidence, that established beyond a reasonable doubt that the victim had not fallen, but rather had died from injuries sustained as a result of physical abuse. The medical examiner's testimony provided the jury sufficient evidence from which to conclude that the

child's death could not have been caused by natural or accidental causes. The examiner's testimony demonstrated that the child's injuries were too severe and distinctive to support defendant's theory that he died from an accidental fall, as only a fall from at least three stories' height could have caused such severe injuries. Moreover, the medical examiner's autopsy revealed numerous bruises and abrasions on the victim's head, neck, face, torso and ankle, suggesting that extensive physical abuse had caused the victim's death, not a fall or a fluke.

In addition, inconsistencies in defendant's accounts of the purported "accident" undoubtedly eroded his credibility with the jury and ultimately doomed his defense. His "911" call suggested a recent accident, yet the medical examiner determined that the child was injured several hours before defendant placed the emergency call. Defendant also gave conflicting reports about where and how the child's alleged fall occurred. Defendant told the dispatcher who received his "911" call that the child had fallen from a bunk-bed located in the basement. However, when subsequently asked how his stepson was injured, defendant told the medical personnel who responded to his call that the child fell out of his crib in the upstairs nursery. These inconsistencies undercut defendant's credibility, and thereby supported the jury's conclusion that child abuse, rather than an accident, caused the child's injuries and subsequent death.

Accordingly, we conclude that any and all error in admitting the challenged evidence was harmless beyond a reasonable doubt.

## CONCLUSION

The warrantless search of defendant's residence on March 21 was conducted pursuant to his wife's voluntary consent. However, the extent of the search, particularly the damaging manner in which some of the evidence was seized, exceeded the scope of her

---

from the dented bedroom wall on March 21 were properly seized because they fell within Lisa Genovesi's consent to enter the home and search for evidence. *See supra* note 5. Therefore, we need not specifically address the probable impact this evidence had on defendant's conviction. We

note, however, that the photographs did not show the injured victim and were in no way inflammatory. Moreover, the State conceded it could not identify the strand of hair embedded in the dented wall as belonging to the victim.

consent. Although it was error for the court to deny defendant's motion to suppress that evidence which exceeded the scope of consent, such error was harmless beyond a reasonable doubt. Likewise, while it is possible that evidence obtained in the March 20 search was erroneously admitted because the exigency that justified the warrantless entry had dissipated, any such error was also harmless beyond a reasonable doubt. Accordingly, defendant's conviction is affirmed.

GREENWOOD and WILKINS, JJ., concur.